Hear ye, hear ye, hear ye. The United States Court of Appeals for the Fifth Circuit is now open according to law. God save the United States and this honorable court. Thank you and welcome everyone. It's good to have you. I think y'all already are probably pretty familiar with how this video process works, but remember to mute yourself when you're not speaking, the lawyers, and recall that while this is being video streamed to you all, you should not be recording it or taking pictures or anything of that nature. Now as it is true when we're all in New Orleans together, please remember that when you talk about the record, giving us record sites is very helpful since particularly in this record we were, I was not able to memorize every page, just most of them. So obviously giving us record sites is helpful and please recall, of course, that rebuttal is for rebuttal only. So with that, we will start with Mr. Mala on behalf of Schultz and Lynn. Thank you, Your Honor. Michael Mola. I represent the defendant appellants Gerald Schultz and Amy Herrig. Your Honors, I'm going to cover issues one and two of my brief. Issue one is the sentencing argument. Mr. Klein is going to cover issues three, four, and five of my brief, which are issues one, two, and three of his brief, which are the Marinella issues and the jury instruction issues. I'd like to start with issue two, primarily regarding the error that I believe the court, the district court, committed in upward departure. The upward departure to 36 months for Ms. Herrig and Mr. Schultz was based, you know, as you know, on section 2 and 2.1 application note 3a. And our argument is that even when there is evidence that the defendant created a two-level increase, here there was no culpable mental state found by the court because the court did reject the government's request for an increase under 2B1.1 application note 16a. But yet the court upward varied nine levels for Ms. Herrig and eight levels for Mr. Schultz. Now, this court previously in United States v. Hebert, which I cite on page 62 of my brief, the citation is 813 Federal Third 551, this court held that in imposing an upward variance, the court must thoroughly articulate its reasons and its reasons should be fact specific and consistent with the sentencing factors in section 3553a. So, you know, in preparing for the oral argument, you know, I scoured the record one more time to find out, to figure out what facts could the court have depended on to determine that, you know, my clients, their actions created a substantial risk of bodily injury or death, whether there was a mens rea or not. And I found four particular points in the record I'd like to point out to the court that I believe the court may have gotten this or reached this conclusion, excuse me. First, during the, you know, there were two sentencing hearings, the sentencing hearing started in August 2019, it was adjourned, and then it was finished in October 2019. During the first sentencing hearing, this government put on Dr. Stacey Hale, who is a ER doctor at Parkland Hospital. And Dr. Hale's at 10484, you know, when asked, you know, what do you think was causing the uptick in ER cases? Because she described what she referred to as a zombie apocalypse. And her response was, obviously, we have no way in the ER to know what specific substance, which taking the packages off the K2 packages, she referred to them, off the patients themselves, or the paramedics were handing us the packages. Now, K2, as a court probably knows, this is a generic term for, you know, synthetic pot, synthetic marijuana, there was no evidence tying anything that gas pipes sold to what Dr. Hale was describing. And she even said that we don't know what substances were causing these problems. So that may have been one part, you know, one source of why the court believed that, you know, my clients created a substantial risk of bodily injury or death. But again, nothing ties what Dr. Hale described to my clients. Well, what about the problem that the reason why the FDA needs to know about this kind of thing, and why you shouldn't put not for human consumption, when it is for human consumption, you're trying to find out what harm it can cause to humans? Why isn't that a piece of this, that the failure that their conduct in just throwing this out there, regardless of its impact on people, is itself a problem? Well, Your Honor, there's no doubt that the synthetic, you know, THC or synthetic marijuana is not good for you. The question is, I believe, did gas pipes sell anything that caused a substantial risk of bodily injury or death? Now, during the testimony of the managers who work for gas pipe, several of them, as you recall, on the record, described smoking the product. They described getting high. A gas pipe sold a lot of this product. Now, there's no doubt about that. I believe that if any person, certainly there's no evidence of anyone, you know, dying or being severely injured, but if any person even suffered what's referred to as bodily injury, the government would have found a single person that would have come to testify about this or presented evidence about that single person, but they didn't. And again, you know, the question is, you know, if there's evidence that the defendants consciously caused a substantial risk of bodily injury or death, that'd be one thing, but even the district court found that they did not. And, you know, during the second sentencing hearing at record site 10597, the trial prosecutor, Mr. Meacham, he asked for an upward departure to 60 of something that he referred to as a Hail Mary pass. And the reason he gave that for this Hail Mary pass is because of the dangerousness of what they did. And he didn't cite any evidence regarding the dangerousness of what gas pipe did. He simply referred to, you know, saying that, you know, I worked as a prosecutor for 27 years. Your time is sort of limited. I have just one sentence. In your reply brief, you assert that no other gas pipe employee received more than 36 months imprisonment. Do you stand by that assertion? And specifically, could you tell me, was Justin Laney an employee of gas pipe? And if so, didn't he get 41 months? But Justin Laney, I don't believe was an employee of gas. I thought Justin Laney worked for another one of the defendants, I thought. Okay, well, you would know better than I do. I guess my question again is, is your reply brief statement accurate that no other employee got more than 36 months? Well, yeah, no other employee that I'm aware of, Your Honor, got more than 36 months. The only one who came close to 36 months was one of the managers who had testified. And keep in mind, you know, he had got, he had reported to jail, he went to jail on his own. He reported to jail very early in the process shortly after the indictments. But I'm not aware of any other gas pipe employee that received more than 36 months in jail. And I went through each one of the employees in my reply brief, Your Honor, and I cited to the record. But co-defendants like Xiao Wan, he got a substantial sentence, correct? Well, Xiao Wan received, I believe, about 36 months, if I recall. But again, Xiao Wan was not a gas pipe employee. Xiao Wan, as you know, Your Honor, worked independently for his own company. And he was one of the persons who was selling. You're right. Maybe you should, you have very little time. Do you want to jump to your sufficiency argument? Is that contending there wasn't evidence of an intent to defraud? That's going to be your argument? Yeah, Your Honor, on the sufficiency argument, again, you know, if gas pipe, if Mr. Schultz and Ms. Herrig intended to defraud any governmental agency, I don't think it was the FDA. You know, the issue, you know, the recurring theme during the trial, as far as what you answer, why they would put not for human consumption, other than to avoid the FDA, what other reason could there be when you're trying to sell something for people to smoke, to say not for human consumption? Well, Your Honor, the putting not for human consumption was an industry standard. You know, you know, everyone that was selling this product was putting not for human consumption on. But why? What are you accomplishing by doing that, other than avoiding the FDA? Well, Your Honor, again, again, it was an industry standard. And, you know, but I don't know what Campbell specifically said it was to avoid regulation. So the jury heard witnesses claim why it was done. Well, Joshua Campbell, Your Honor, I covered that in my appellant's brief. Joshua Campbell, I believe, speculated. He didn't say he ever heard any of the defendants say that we're putting this, you know, warning of not for human consumption on our product to avoid FDA scrutiny. The only time that even the word FDA came up is that one email that Ms. Herod sent. And that email, as I covered, you know, in my reply brief, she was obviously referring to the DA, not the FDA. I believe my time is up. Unless anybody has any other questions. Okay. Thank you, Mr. Mala. We'll turn to Mr. Klein. Thank you. May it please the court. My represent the two corporate appellants here, Gaspard and Amy Lynn. I want to talk briefly about two issues. One is the effect of Marinello on the conspiracy, the Haas-Hammerschmidt conspiracy to defraud theory. And the second is the element of materiality required for the second conspiracy, the conspiracy to misbrand. Let me start with Marinello. The statute in that case bears a striking textual resemblance to the Haas-Hammerschmidt formulation of 371. It involves impeding the due administration of the tax code rather than any lawful government function, but they're very similar. The issue in that case was whether that language of the due administration of the tax code should be read as broadly as possible to include any function by the IRS or whether it should be narrowed to a targeted function that was reasonably foreseeable, at least to the defendant. The Supreme Court took the latter view, the narrow view. It did so for reasons of fair warning, concerns about unbridled prosecutorial discretion, concerns about converting misdemeanors into felonies. All those reasons apply equally to the conspiracy to defraud theory under Haas and Hammerschmidt. The concerns about fair warning, the concerns about prosecutorial discretion, and the concerns that if you allow any dishonest agreement to interfere with a lawful government function, if that's a crime, then you're going to be criminalizing a lot of things that are criminal code as misdemeanors. So what we asked the district court to do, what we're asking this court to do, is to take a fresh look at the Haas-Hammerschmidt theory in light of Marinello. Mr. Kline, we are told repeatedly by the United States Supreme Court that they are the ones who changed their precedent, not us. And we're not supposed to look at TLEs. We're not supposed to predict what they're going to do. We're supposed to follow what they have told us. And why would we not do that here? Well, certainly on what I might call our global issue, which is whether the Haas-Hammerschmidt theory can survive. You're absolutely correct, Your Honor. We've raised that issue to preserve it for later review by the Supreme Court if necessary. The application of Marinello to the Haas-Hammerschmidt theory I don't think is in the same category. There are two courts of appeals that have at least briefly considered that issue, the Second Circuit in Attila and the Eighth Circuit in Flynn. Although they both took a different view than we think is correct, I don't think either suggested that it was incapable of deciding the issue. I think an intervening Supreme Court decision, such as Marinello, I think permits this court to look at past precedent in light of that decision. And that's what we're asking the court to do. That's why I'm not spending my time talking about overruling Haas and Hammerschmidt, because of course you can't do that. Much as we might wish you could, you can't. If we don't graft Marinello and we are bound by Haas and Hammerschmidt, because the jury had a unanimity instruction, would you agree that we wouldn't need to, since the only conviction here was count one, we wouldn't actually need to reach the materiality question embedded in 333? Yes, Your Honor. We need to win both of those issues to prevail on count one, because of the unanimity instruction. I would respectfully ask the court to reach both questions, because we do intend to try to present this issue to the Supreme Court. And it would provide a- Maybe the hardest question here is the materiality, but I have sort of one common sense question and one legal question. The common sense question is, in a case like this one, where it was stipulated that they were mislabeled, and the effect of mislabeling is you don't get FDA oversight. How could that not have influenced the FDA? That's the common sense question. And then the legal question is, when I look at your proposed jury instruction five, and the fourth element, you did describe materiality as an intent-based issue, looking at whether or not the offender had an expectation of influencing. So I don't see that as really a substantially correct statement of what materiality was in Nader. So the two questions are, one, how could it not have influenced? And the second question is, did you actually substantially correctly describe materiality as capable of influencing the victim when you requested it? Let me start with the first question, Your Honor, which is really a harmless error question. Isn't this just harmless because- Yes, you're exactly right. And this is an unusual case because there was no evidence that anyone believed the not for human consumption label or the other labels on the Certainly, the customers didn't. The police didn't. There was an FDA witness who came in and testified that they described the misbranding statute and testified that the packaging was mislabeled. But even that witness never said that the FDA in any way was fooled or relied upon this labeling. Everybody knew what this was, which sets this case apart from the typical materiality case. Right, but you agree with me that had they said for human consumption, that would have triggered FDA regulation necessarily. There's no doubt. This substance was subject to FDA regulation. I don't think the FDA was not regulating it because it was labeled not for human consumption. And then quickly, because I'm taking too much time and I'm sure Judge Haynes will allow more if I've dominated the questions. But the second question, did you preserve it? I believe we did. The language that we took, first of all, to back up, the materiality requirement springs from the intent to defraud. It is the term defraud that gives rise to materiality. So linking it to the intent was, I think, correct under Nader and other cases. The formulation, the precise formulation of materiality is an interesting question. And I recognize, Your Honor, that capable of influencing decisions is the formulation that you find in Nader and elsewhere. We took the language directly out of Watkins. That was the only authority on point. We took that language. But certainly, we would have had no objection if the district court had formulated the materiality requirement differently. It just needed to be in there in one form or another, and it wasn't. And I think everybody recognized in the district court and in the briefing of this court, that what we were looking at was the question of materiality, however formulated. Okay, why put not for human consumption if it doesn't matter? You are trying to sell it to humans for their consumption. Your Honor, I have, I tried this case along with others, and I've wondered the same thing. I don't think there was evidence that it was designed to fool the FDA. And certainly, there's no evidence that anyone- There's a difference between fooling the FDA, that's a reliance issue, and avoiding the FDA. Because as soon as you say this is for human consumption, or you don't warn that it's not for human consumption, you bring the FDA in the mix. I understand, Your Honor. But the FDA, nothing about that label prevented the FDA from taking action if it had wished to. Certainly, there were other federal agencies, primarily the DEA, that was all over this issue. And everybody understood that this actually was for human consumption. Why was that label put on there? I would have to go outside the record and speculate to answer the question. I think somebody somewhere along the line had the idea that it would offer some sort of protection, maybe against state law, maybe against liability from customers. All of that is just speculation. The one thing I can say with real confidence is I don't believe from the record in this case that it was designed to somehow circumvent the FDA. And the FDA was free. It was no secret that- I'm sorry I've used my time. Well, I just think materiality and reliance are two different things. If I lie to you about something really important, and but you knew I was lying, then it would be material, but you didn't rely. And that's the question that I was asked before about reliance versus capable of influencing. And again, the language that we chose for our instruction came directly from Watkins. But the concept we were getting at and that Watkins was getting at is materiality. And whether that's formulated as capable of influencing or some form of expectation of reliance, which is what I think Watkins used, either way, materiality needed to be an element of this case. And going back to Judge Higginson's question, this is one of the rare cases, I think, where the failure to instruct on materiality was not harmless beyond a reasonable doubt. Okay. Well, you've used your time and I went over it with you. So, we will now turn to Mr. Gilstrap. Thank you, Judge Haynes, and may it please the court, Stephen Gilstrap on behalf of the United States. This court should affirm the defendant's convictions and sentences which stem from a calculated and sustained scheme to misbearing spice, a dangerous synthetic cannabinoid as being not for human consumption so they could avoid FDA regulation and oversight. What is your response to this argument that nobody showed it, it really was all that harmful? On the sentencing point, I believe there was evidence that it was harmful, as Mr. Mola referenced. At the sentencing, there was testimony from Dr. Hale that went through the potential dangers. That's at record 104, 75 through 84. There was a reference to, when people started ingesting spice in large quantities, ERs were filling up. It was, as she referenced, the zombie apocalypse. There's also evidence in the record at manager meetings where employees of Gaspipe were talking about spice overdoses that they see in the news in Plano and other places. So, I think this is a dangerous synthetic cannabinoid. And as to the sentencing point, Mr. Mola's argument is a bit different from the one actually raised in his brief. I mean, his brief is focused on the number of levels of a departure, not whether the court rightfully imposed a departure in the first place. So, I was a little surprised to hear him argue that out of the gate this time. Well, and if we have questions about the departure, didn't Chief Judge Lynn also say or variance? I mean, so in other words, if there are some issues with departure, do we need to walk down that path or do we just walk down the variance path? No, no, Your Honor. And as the government said in its brief, the easiest path to affirm the sentence here likely is the variance path, just because Judge Lynn made very clear that she was departing upward as well as varying upward. That's at 10652 of the record. And I don't think there's any real dispute that Judge Lynn carefully weighed the 3553A factors, her analysis, where she talked about the very serious nature of the offense, the deception, the risk of this dangerous and addictive product, the need for deterrence, etc. That's at 10648 through 5-1 of the record with regard to Ms. Herrig. Well, my impression of the defendant's argument is that they're saying that she like did a departure and then varied from the departure, and that's why the departure mattered. But that is not how I read it. But if you want to respond to that. That's not how I read it either, Judge Haynes. I think Judge Lynn was pretty crystal clear when she said, I'm doing this as a departure and as a variance, as an upward departure and an upward variance. I think I just gave separate pillars as opposed to one on top of the other. Indeed, indeed. I believe that's clear from the record. And so that's why the variance, the abuse of discretion standard is the most straightforward path to affirmance on the moving back to the sort of legal arguments that Mr. Klein raised. I'll address those and move to the to the factual sufficiency arguments unless this court has a different preference on the 371 defraud clause arguments. As Mr. Klein referenced, there are two arguments. One is directly foreclosed the property requirement by Haas Hammersmith. The second depends on Marinello. And what defendants are asking for is this court to impose a nexus requirement that the Supreme Court, nor any other court, has ever imposed on Section 371's defraud clause. As Mr. Klein conceded, Marinello involved an omnibus tax code statute, 26 U.S.C. 7212A, that frankly has a different language than Section 371's defraud clause, has different context, and has a different history. That's what the Second Circuit in the Attila case said. That's what the Eighth Circuit in the Flynn case said when they said Marinello doesn't provide us a basis to basically tell the Supreme Court, in reference to your question, Judge Haynes, what Section 371's defraud clause really means when the Supreme Court has told us for 100 years what the defraud clause means. And so I think the fact that no court has imposed the sort of nexus requirement on Section 371's defraud clause and the fact that the Supreme Court hasn't said so and has consistently over the past century or so rejected attempts to limit the defraud clause, either by this nexus requirement or in other ways, I think counsels against this court using Marinello as kind of an excuse to pare down Section 371's defraud clause when it doesn't really provide that basis based on the different statutory texts. I've got an overarching question. It's a complex question. It's a complex case for the jury because basically the defense wins on the bulk of the prosecution. It's a big DEA, and they decide these aren't drug traffickers. These are opportunistic businessmen who defrauded the FDA. I guess the specific question I'm thinking, the case that seemed closest to me was the Seventh Circuit case, the Sykes rights. The Desert case, yes. Did the government charge in the overarching conspiracy both alternate means, or did they just go with felony misbranding? That was not actually even a conspiracy case, Your Honor, so it wasn't within 371's gambit, but it focused on the substantive 333. Do you have any circuit authority dealing with the, because this case to me reduces in the end because of the jury verdict to a question of scienter. That's what it comes down to under either of them. I guess my specific question is, is there any circuit authority that considered and teased out jury instructions as to scienter as to both objects of a single conspiracy? Related to that, if you're noting this down, is do those two instructions on scienter collapse to the same thing? Is it an intent to evade or impede? Right, right, Your Honor. The answer to the first question is there are cases, including this court's decision in the United States versus Haas that cited in the government's brief, where both prongs of 371 are charged, the defraud prong and the conspiracy to commit felony misbranding, and both convictions are upheld. Frankly, when courts have analyzed this issue, I would look to Haas, and then I would, even though a defraud prong conspiracy wasn't charged in the Ellis case, there is a discussion of jury instructions that raised a kind of similar issue in the Ellis case out of the Fourth Circuit. But on the question of scienter, in the courts that have considered this, there is to an extent a large collapsing of intent to defraud for the purpose of the defraud prong and intent to defraud or mislead for the purpose of felony misbranding. And to one thing, and that then gets me to, okay, do you have a problem if materiality is inherent? Because I don't see you saying that they didn't preserve it. I don't think you even said that it wasn't given substantially correctly. So if the Nader materiality element was requested and is applicable, is sort of presumptively applicable in fraud, it does seem to be part and parcel of intent. Can you unpackage that? It's not a clean question, do you? Sure, but I believe I understand what your honor is getting at. I would say that if anything, the case law would suggest the other outcome, which is where you have a conspiracy to commit felony misbranding against the FDA, a government agency, not, I mean, here there is evidence, and the district court also said that there was sufficient evidence. Vis-a-vis consumers, but the focus of the government's theory here was vis-a-vis the FDA and where the target of the intent to defraud is a government agency. I do think there's some similarity between the two because at the end of the day, you're looking at what did they do to intent to defraud or mislead the FDA. But I think what it does is it's clear from the precedent that there is no and there is no materiality requirement for the purpose of 371's defraud prompt. So the fact that courts are analyzing these issues fairly similarly, I would suggest, except for the Watkins case, really does suggest that when you have a felony misbranding conspiracy vis-a-vis the FDA, it really is more like an intent to defraud under 371's defraud. Again, that's very clear, and that's why I'm interrupting you because I understand where you're going. Do, for you to prevail, do we have to say that the Ninth Circuit was wrong in Watkins? And if not, why not? I don't believe you do for two reasons, Your Honor. One of, I believe you suggested both of them in your questions to Mr. Klein. First of all, I believe that these are two separate conspiracies, or they're two separate means under count one of the conviction of count one. The court gave a unanimity of theory instruction, and the jury convicted both under the defraud prong and under the felony misbranding offense prong. The materiality point, defendants have only raised it with regard to the felony misbranding prong, period. It doesn't impact or upset, and there's no- But it would help district courts if we clarify, because the government often does charge, as in Dessart, just the felony misbranding. So it certainly would help them. Even if we were to say harmlessness, it would help to know is materiality something you've got to instruct on or not. I agree with Your Honor that it would provide guidance on that. The second reason that this court doesn't need to fully decide it, though, is the harmlessness point. As Judge Haynes has asked several times during the argument thus far, at the end of the day, you have a fundamental question, which is why misbrand the spice is not for human consumption if you weren't trying to mislead the FDA. And I think the Seventh Circuit's Dessart decision really goes to the heart of it. That case involved affixing a full research-only label on human growth hormone that was intended for human consumption. The Seventh Circuit, in that opinion, asked the question, Judge Sykes asked the question, why do this if you're not trying to mislead the FDA into not being able to fulfill its regulatory function? So with that, I'll move on to the factual sufficiency points because I want to kind of unpack the record a little bit for the court just because it's a large record and I think it may be helpful. So on the issue of whether there has been an intent to defraud or mislead for the purposes of felony misbranding, this court's decision and Haas and Arlen and other courts and Ellis, the Fourth Circuit and Ellis, the Seventh Circuit and Dessart, the analysis really follows like this. Courts look at what the defendant knew in terms of did they know that they were misbranding or violating some provision of the FDCA. And then the second piece is what active steps were taken either to, in some cases, misrepresent something to the FDA or in a case like this, what did they do to actually conceal their operation from the FDA? So those are kind of the two pieces that courts look at and I'll march through kind of what the evidence was on each piece. On knowledge of misbranding, I don't think there's really any dispute in this case. As Judge Haynes pointed out, there's a stipulation here that defendants knew what they were selling was a drug, that it was intended for human consumption and that it was misbranded as not being for human consumption. You have documentary evidence in the record. You have another email from Bridget Payrott who was an employee of Gas Pipe reminding store managers, quote, if it is herbal incense, it is illegal for human consumption. That's an ROA 9483. The other thing I think in the record that really shows the knowledge on behalf of defendants beyond their stipulation, beyond this other evidence, is when you look at the manager meeting minutes, they're closely monitoring what the FDA is doing. There's a discussion in the meeting minutes when there's an FDA raid of Captain Amsterdam, another seller of similar products. That's an ROA 11474. And then they specifically talk about an FDA raid where the meeting minutes talk about how the FDA is, quote, trying to get people on intent, parentheses, selling for human consumption. And then in all caps, the meeting minutes from Ms. Silva who was a Gas Pipe store manager said, do not sell if they say they're going to smoke it or even insinuate it. Watch out for other conversations such as people buying it to they had knowledge that what they were doing was contrary to the FDA regulations. They knew that they couldn't sell it but for the misbranding, and so they misbranded it. Active steps to conceal their operation from the FDA. Mr. Mola talked about how labeling not for human consumption was an industry standard. Be that as it may, I think it's important to look at specifically the label that Gas Pipe created for its in-house brand of spice that it began manufacturing in 2014 called Pour. It doesn't simply just say not for human consumption. If you look at the label and testimony about this is at ROA 8763, that label doesn't just say not for human consumption. It says take the potpourri or incense, put it in an incense burner and let the aroma fill the room with peace, love, unity, and respect. It's giving specific instructions, not just saying not for human consumption. You're supposed to burn this as incense. Whatever the industry standard is, and I don't think that's a defense, that goes far and beyond just simple like, oh, we just put it on there because everybody else was doing it. And I think that goes to intent. And as the Desert case points out, you have to look at what the way that the spice was misbranded here. And I think as Judge Haynes has asked, it goes to the heart of the deception. It goes to the heart of the concealment. And just like in the Desert case, there's really no other explanation other than you're trying to hide what you're doing from the FDA. Here's just a silly question, though. If we're just focused on deceiving the FDA, had they revealed this to the FDA, all they would have gotten was a label saying exactly what they put on it, right? FDA would have said you can't consume it. Right. You can't consume it. But I think the issue is that it was intended to be consumed. I mean, that was part of the stipulation. I mean, I think the FDA would have then looked closely at what was in this spice. They would have said, like, well, why are you putting chemicals in a spice that's just meant to be burned as incense when putting acetone or other chemicals don't affect the smell or the aroma that's given off? I think it would have caused a lot more questions to be asked and answered and I think would have led the FDA to crack down. And why are you charging so much and giggling about all of this? I mean, this is kind of this giggling approach to selling this as opposed to when you go to a place to buy actual incense, not giggling about it. And they're not charging, I don't know, 10 times what most incense costs. They're not making it stinky. They're making it nice. I mean, et cetera. So it's kind of a whole genre that's different from ordinary incense. Right. And that's what I mean, it's a, as Lawrence Schwan testified to, it's a catch me if you can sort of operation. And Mr. Schwan also specifically testified to, and these were his quotes, you know, putting not for human consumption labels was, quote, the only way we could sell it to the public. It was stated for human consumption. If it was stated for human consumption, it would be subject to FDA regulations. And obviously we wouldn't be able to sell these products for human consumption. That's at ROA 92.17 through 18. And Joshua Campbell's very similar testimony specifically said, quote, Jerry and Amy referring to Mr. Schultz and Ms. Herrig didn't want to sell it as a consumable because it would have to go through the FDA. That's at ROA 95.15. Campbell was an employee, Schwan wasn't, correct? Schwan was the supplier of Spice up until he sold his inventory, his remaining inventory, to GasPipe, I believe in late 2013, before GasPipe began manufacturing and it's on its own in 2014. And Mr. Campbell was the store manager of the store in Albuquerque. And he's the one, as you may recall from the record, that getting back to the other evidence of active concealment, GasPipe was instructing its employees to actively conceal its operation and say, don't sell to anyone if they say that they're going to suggest smoking it or ingesting it or anything like that. I think on the theory that if you're not already in the know, and you don't know that this stuff is meant to be, intended to be smoked and consumed, then we're not going to enlighten you because there's a risk that you may be with the FDA or another regulatory agency. And those repeated instructions, which are in the record at 88.39 through 40 and 94.61 through 64, as a few examples, caused Joshua Campbell to lie to the Albuquerque police when they came in his store and said, hey, are you selling Spice? And he said, no, because his instructions had been, we're not going to call it Spice because that suggests some idea of illegality. We're going to call it potpourri or herbal incense or these sorts of things. You're instructed not to talk about the taste of Spice. Back just on sentencing with your last minute, did any co-defendants get more than 36 months that were employees of GasPipe or not? So Mr. Yarborough, which he was an employee, he did receive 36 months. That's outlined in the defendant's reply brief on that point. I'm not aware of any other employees that got 36 months. I don't think there was a clear line of demarcation, but as your honor pointed out, I think there was a reference to Lawrence Shawan. He got 72 months. I mean, there were co-defendants that were sentenced above the statutory maximum. And these two are not just employees. Right. They're the owners. Yes, exactly. So to me, it seems like a reverse argument. If I were just the little employee and I got more than the boss, then I'd be making that argument. But it seems to me that the boss making the argument that they should get less than the employees seems like a bit of an odd argument. I agree, your honor. And I think that's what Judge Lynn was getting out when she made that statement. And when she made that statement, Ms. Herrig at sentencing said, I agree. And I recognize that even though by not holding defendants responsible for the drug quantities, by giving them a significantly lower sentence really didn't account for the 3553A factors. And I see my time has expired. And for those reasons, the government respectfully asked that this court affirm the convictions and sentences. Thank you, your honors. Okay. I think only Mr. Klein reserved time for rebuttal. So we'll hear from you. All right. There you go. Okay, good. Sorry about that. Still learning. Let me make two quick points. One goes to a question Judge Higginson asked. I think the government argued that the intent standards for these two conspiracies collapse into one another so that the intent standard for 333A2 essentially becomes the same as the intent standard for the 333A2. The interpretation of defraud in Haas-Hammerschmidt is unique. I don't think there is any other federal statute that interprets defraud that way. I think in every other federal statute, certainly in the mail and wire fraud statute, certainly under Watkins, 333A2, the term defraud is given its common law meaning, which is not the meaning that Haas and Hammerschmidt give that term. Two further points on that. If, in fact, in a misbranding conspiracy directed at the FDA, the Haas-Hammerschmidt intent standard applied, you would have two different meanings for that term in 333A2 depending on who the target was, on who the victim was. You'd have one meaning for the government, the FDA, and you'd have a different meaning if a consumer was the target. That just can't be right. If these counts had been charged separately, if there had been two conspiracies charged in separate counts, I don't think there's much doubt that the intent standard in the misbranding conspiracy would be formulated differently than the intent standard for the conspiracy to defraud. There is a difference there. There should be a difference. There wasn't in this case. The two got folded into each other partly because they were combined in one count. I think that was error. One final point on this materiality question. There was an FDA witness in this case. He came in and he testified and he could have testified to pretty much anything he wanted, including that the FDA would have done various things if only the not for human consumption label had been left off of these products. There was no such so thoroughly impeached if he had said that. This was widely publicized. Everyone knew what these products were being used for. The DEA knew. The FDA knew. If the FDA had wanted to regulate them to take action, it certainly could have, notwithstanding the not for human consumption labels. Thank you. Thank you, counsel. We appreciate your argument and the case is submitted.